UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ) | |
| ) | CASE NO.: |
| INFORMATION ASSOCIATED WITH ) | |
| FACEBOOK PROFILE/ACCOUNT ) | |
| USERNAME JOSEPH.HALLFORD THAT IS ) | |
| STORED AT PREMISES CONTROLLED BY ) | |
| FACEBOOK IN MENLO PARK, CA ) | |

AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT

I, Garrett Nabors, being first duly sworn, hereby depose and state as follows:

INTRODUCTION AND AGENT BACKGROUND

1.   I make this affidavit in support of an application for a search warrant for information associated with the Facebook profile/account username of joseph.hallford (the "Account") that is stored at premises owned, maintained, controlled, or operated by Facebook, a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the Account.

2.   I am a duly appointed Special Agent of the Federal Bureau of Investigation ("FBI"), and have been so employed since 2011. As such, I am an "investigative or law enforcement officer of the United States" empowered to make arrests within the meaning of Title 18, Section 3052, of the United States Code, and to execute search warrants and seizures within the meaning of Title 18, Section 3107, of the United States Code, for offenses in which the United States Government is a party of interest. Prior to my employment with the FBI, I was

employed as a U.S. Army Officer. As a Special Agent with the FBI, I have worked on cases involving domestic terrorism, including white supremacist extremism, militia extremism, animal rights extremism, and civil right violations. Through instruction, training, and participation in investigations, as well through consultation with other agents and law enforcement personnel, I have become familiar with the manner and methods by which criminals conduct their illegal businesses during the planning, preparation and execution phases.

3. Because this affidavit is being submitted for the limited purpose of establishing probable cause for a warrant to search the identified information and to seize evidence, fruits, and instrumentalities of criminal activity that may be found therein, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth only those facts that I believe are sufficient to establish the necessary foundation for the search warrant.

4. I make this affidavit based upon (a) personal observations and knowledge; (b) conversations with other law enforcement agents who have participated in this investigation and related investigations; and (c) review of documents connected with the investigation. I believe the information received from others to be truthful and reliable to the best of my knowledge. Where I have reported statements made by others, or from documents that I have reviewed, those statements are reported in substance and in part, unless otherwise indicated.

5. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 26 U.S.C. § 5861 (Possession Unregistered Firearm), 22 DC Code § 4504(a-1) (Carrying a Rifle or Shotgun (Outside Home or Place of Business)), and 22 DC Code § 4504(a)(1) (Carrying a Pistol (Outside Home or Place of Business)) have been committed by the individual using the targeted Account.

There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## PROBABLE CAUSE

6. On or about Monday, November 4, 2013, Hallford, drove his father's red, four-dour 2012 Chrysler, bearing Alabama license plate number 38D27V8 (the "Vehicle"), from his home in Slocomb, Alabama, toward Washington, DC, to participate in a planned protest demonstration and march called the "Million Mask March" to be held in front of the White House on November 5. He arrived in DC on the morning of November 5 and participated in the planned event later that day.

7. On or about November 6, at approximately 4:53 AM, a United States Park Police ("USPP") officer found the Vehicle parked on Ohio Drive, S.W., just south of Independence Avenue, S.W. The USPP officer placed an "unattended vehicle" tag on the vehicle. On the day before, November 5, Hallford had checked himself in at the George Washington University ("GWU") Hospital Emergency Room in Northwest DC, complaining of internal bleeding and pain. While there, Hallford was "aggressive toward staff," threatened to cause physical harm to members of the staff, and indicated that he had come to DC to provoke the United States Secret Service ("USSS") to shoot him. Based on his statements and overall conduct, he was involuntarily committed for emergency observation and diagnosis for a potential mental illness and transferred to the United Medical Center ("UMC") in Southeast DC.

8. On November 6, the USSS was notified of Hallford's statements. That evening, two Special Agents with the USSS went to UMC to attempt to interview Hallford about his statements. Upon coming into contact with Hallford (who was unrestrained and retained some freedom of movement within the UMC), the USSS Special Agents identified themselves to

Hallford, advised him that he was not under arrest or in any trouble, and asked him if they could speak with him further about some alleged statements he had made about the USSS. Hallford agreed to answer the agents' questions and a noncustodial interview began. During the interview, Hallford stated, among other things, that he had driven from Alabama to DC to attend a protest in front of the White House on November 5. Hallford further relayed that during the protest, he had opened up a black trench coat he was wearing and yelled "Shoot me, shoot me" to law enforcement personnel that he believed to be working for the USSS. Hallford denied to the interviewing USSS Special Agents that he wanted to be shot by law enforcement personnel. When later questioned about his ownership of any weapons, Hallford admitted to the USSS Special Agents that he did own some. Hallford initially indicated that the weapons were located at his home in Alabama, but later corrected that statement and acknowledged that the weapons were in a vehicle he had driven to DC (i.e., the Vehicle). Hallford also told the agents that if they looked in the Vehicle, they would find some "bad things" there, including multiple firearms and a "Molotov cocktail." Hallford stated that the Molotov cocktail in the Vehicle was for "protection against gangs in Alabama." When the agents asked Hallford where the car was located in DC, Hallford stated that he did not recall exactly where he parked the Vehicle or its license tag number. Hallford did, however, indicate that the Vehicle was his father's.

9.     After interviewing Hallford, the USSS Special Agents contacted Hallford's father by telephone and obtained additional descriptive information for the Vehicle, including the color, make and model, and license plate number of the car. The USSS thereafter relayed the Vehicle's identifying information to various law enforcement agencies in DC and VA in an effort to locate the vehicle.

10.     On November 6, at approximately 7:50 PM, USPP Communications issued a

radio broadcast over law enforcement channels to be on the lookout for the Vehicle. A USPP officer recognized the lookout description as matching that of the Vehicle, which had been tagged as an "unattended vehicle" earlier that day (see paragraph 5 above). The USPP officer went to the location of the Vehicle and positively identified it as being the subject of the lookout. The USPP officer requested assistance from the Metropolitan Police Department's Explosive Ordnance Disposal unit ("MPD EOD") because the Vehicle was parked in close proximity to the Lincoln Memorial, and there was a large volume of both pedestrian and vehicle traffic in and around the immediate area of the Vehicle. MPD EOD secure perimeter was established around the car. Around the same time, a USSS Special Agent contacted Hallford's father again and obtained consent to search the Vehicle for weapons or other evidence of criminal violations.

11. On the evening of November 6, 2013, MPD EOD made entry into the Vehicle. The following items were found inside a suitcase on a rear passenger seat of the vehicle:

- A brown glass Worcestershire bottle containing, among other things, a firework, several unlit matches, Q-tips coated in a black substance, Styrofoam, an assortment of metal pieces, a "live" round of .22 caliber ammunition, and a rag protruding from the top (i.e., a suspected Molotov cocktail); and

- One .45 caliber semi-automatic AMT pistol with one round in the chamber and four rounds in an affixed magazine.

The following items were found in the trunk of the vehicle:

- One black 12-gauge Mossberg Maverick 88 shotgun with a nine-pellet 00 buck round in the chamber, 14 rounds in the chamber, and a tactical light affixed to the barrel;

- One black, .22 caliber Marlin 60 rifle with one round in the chamber and 14 rounds in an inserted magazine;

- One black .22 caliber Mossberg 702 Plinkster rifle with one round in the chamber and 10 rounds in an inserted magazine;

5

- One large, clear ziplock bag marked "#1 Ultra Fast DEATH Remington .22 Yellow jacket HP + Gold Plated HP" containing .22 LR caliber ammunition;

- One large, clear ziplock bag marked "Military Grade 12 gauge buck shot" containing four boxes of 12-gauge 00 buck shells, one of which was labeled "Joseph Hallford";

- One large, clear ziplock bag marked "#2 HP .22 Lead Death at Speed Next to Fastest," containing two boxes of .22 LR caliber ammunition;

- One large, clear ziplock bag marked "#3 Gold .22 Std Non-Hollow Point Medium Death," containing two boxes of .22 LR caliber ammunition;

- One medium, clear ziplock bag marked "#4 lead .22 standard (Not Hollow point) Slow Death," containing three boxes of .22 LR caliber ammunition and numerous loose ammunition rounds;

- One box of PMC Bronze .45 caliber ammunition, containing 39 rounds;

- One yellow plastic bag containing 20 rounds of green-tipped .223 caliber ammunition and one round of red-tipped .223 ammunition;

- Three boxes of Coleman brand waterproof matches;

- One five-gallon, plastic, gasoline canister with a small amount of liquid, later identified as gasoline;

- One camouflage soft body armor vest; and

- One black and silver hatchet.

Later, among Hallford's personal effects, law enforcement personnel discovered three separate receipts indicating that the shotgun, one of the rifles, and the .45 caliber handgun had been purchased from three separate locations in early October 2013.

12. The USPP later transferred the components of the suspected Molotov cocktail, including the plastic gasoline container with liquid, to the ATF forensics evidence laboratory for further analysis.

13. The ATF has examined the components of the suspected Molotov cocktail and

determined that they constitute a combination of parts either designed or intended for use in converting any device into a "destructive device," as defined in 26 U.S.C. § 5845(f), and from which a "destructive device" may be readily assembled. Hallford has not registered or attempted to register any "destructive devices" with the National Firearms Registration and Transfer Record. Accordingly, Hallford's possession of the above-referenced components violates 26 U.S.C. § 5861(d).

14. The DC Firearms Registration Business Services Division has been contacted to ascertain whether Hallford has ever applied for or received a license or registration to carry a 12-gauge Mossberg Maverick 88 shotgun, .22 caliber Marlin 60 rifle, .22 caliber Mossberg 702 Plinkster rifle, or .45 caliber semi-automatic AMT pistol. Hallford has never applied for or received a license or registration from the DC Firearms Registration Business Services Division to carry a 12-gauge Mossberg Maverick 88 shotgun, .22 caliber Marlin 60 rifle, .22 caliber Mossberg 702 Plinkster rifle, or .45 caliber semi-automatic AMT pistol. Each of these firearms has been test-fired and determined to be operable. Accordingly, Hallford's carrying of the shotgun/rifles and pistol in the District of Columbia violates DC Code §§ 22-4504(a-1) and 22-4504(a)(1), respectively.

15. On November 18, 2013, the United States applied for and obtained a federal criminal complaint and arrest warrant for Hallford. The criminal complaint charges Hallford with violating 26 U.S.C. § 5861(d) and DC Code §§ 22-4504(a-1). Hallford was previously arrested on the DC Code offense alone and remains in custody.

16. On December 19, 2013, a federal grand jury returned an indictment against Hallford, charging him with violating 26 U.S.C. § 5861(d), 18 U.S.C. § 922(a)(4) (Interstate Transportation of a Destructive Device), DC Code §§ 22-4504(a)(1) (Carrying a Pistol (Outside

Home or Place of Business)), DC Code §§ 22-4504(a-1), and several counts of unlawful possession of an unregistered firearm and ammunition. Hallford remains in custody pending trial.

17. As part of its investigation, the United States has determined that prior to his arrest, Hallford resided at 4747 South State Highway #109, Slocomb, Alabama, and travelled from that location toward Washington, DC, on or about November 4, 2013.

18. In connection with Hallford's arrest, the United States obtained a search warrant for Hallford's cellular telephone. On that cellular telephone, the United States discovered pictures of an individual wearing a Guy Fawkes mask posing with several firearms—including some that appeared to be the same weapons recovered from the Vehicle Hallford had driven to DC. The cellular telephone also contained a picture of another individual in a Guy Fawkes mask photoshopped as looking in the window of the Oval Office at President Obama with the text "05th November soon. Ooo Fuck …""

19. During the course of its investigation, law enforcement learned that Hallford used electronic media devices to communicate with others in connection with his trip to DC on or about November 4-5, 2013. For example, on Hallford's cellular telephone, the United States recovered several text messages sent from Hallford to other individuals, including one from November 3, 2013, wherein Hallford stated that he would "have an arsenal in [his] trunk in case the gov wants to get ugly, there's a lot of others that are going prepared to fight back." In other texts Hallford exchanged with cellular telephone numbers associated with users identified as "Jay Gonzo" and "Tess TheRaven," Hallford indicated his desire to find and meet with other individuals before the start of the planned March.

20. Separately, law enforcement has discovered that Hallford regularly used

Facebook account joseph.hallford (the "Account") in the weeks and months leading up to November 5, 2013, and made several publically-available postings to Facebook that day (including photographs) and while hospitalized at GWU. A review of the publicly-available Facebook postings made to the Account before, during, and after the March indicate that various family members, apparent associates of Hallford, and other individuals had knowledge of Hallford's plans to travel to DC. Moreover, numerous Facebook postings made on November 5 and 6 by individuals other than Hallford indicate that those individuals were exchanging information concerning the March, Hallford's involuntary commitment status, and Hallford's contacts with law enforcement authorities while in DC. Such postings to the Account were made by, among others, individuals identified as "Tess TheRaven" (using Facebook username "RavenSchiele"), "Jay Gonzo" (using Facebook username "jay.felon.1"), and "Bad-rum Pete" (using Facebook username "badrum.pete").

21.     During this investigation, law enforcement is, among other objectives, working to ascertain Hallford's specific motivations for transporting a "destructive device" and multiple firearms to DC and apparently wanting to engage in an armed conflict with law enforcement officers, to identify any pre-conflict planning and preparation, and to determine the role of any other individuals in the planning, preparation, or execution of any such armed conflict.

22.     Based on my training and experience, and information provided to me by other law enforcement agents, I know the following: First, criminal violations that involve any degree of sophistication may entail a conspiracy or multiple individuals. Second, individuals intending to commit violent crimes, particularly those involving premeditation and deliberation, often utilize electronic communication methods, including those provided through social media sites like Facebook, to further their criminal intentions and activities by coordinating efforts with co-

conspirators. These individuals will also use social media sites like Facebook to store contact and other information about co-conspirators.

23. The requested material associated with the Account may provide valuable information to address the above-referenced investigative matters.

24. On November 16, 2013, the FBI sent a preservation letter to Facebook to prevent the deletion of any requested material related to the Account.

## BACKGROUND CONCERNING FACEBOOK

25. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

26. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

27. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can

exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

28.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

29.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

30.     Facebook allows users to upload photos and videos. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.

For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

31. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

32. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

33. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

34. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

35. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through

the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

36. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

37. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

38. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

39. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

40. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings;

rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

41.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

42.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

43.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

44.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

**CONCLUSION**

45.     Based on the forgoing, I request that the Court issue the proposed search warrant.

46.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

47.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

Garrett Nabors
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on December ____, 2013

JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook profile/account username of joseph.hallford and/or Facebook account identification number 100000553554248 (collectively, the "Account") that is stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered in Menlo Park, California.

**ATTACHMENT B**

**Particular Things to be Seized**

**I.    Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose to the government only the following information for each Account listed in Attachment A:

(a)    All contact and personal identifying information related to the Account, including the Account holder's full name, user identification number, birth date, gender, contact e-mail addresses, Facebook login details, physical addresses (including city, state, and zip code), telephone numbers, screen names, websites, billing information, and other personal identifiers associated with the Account;

(b)    All records relating to use of the Account, including session times, login/logout times, IP addresses from which it was accessed, and the types of services used;

(c)    All records related to the Account's privacy settings;

(d)    All activity logs for the Account and all other records showing the Account's posts, messages, and other activities on Facebook;

(e)    All photos and videos uploaded by the Account;

(f)    All records—but not content—relating to the Account's list of friends, including any friend requests that were pending or rejected;

(g)    All records of communications—but not content—sent to the Account from another account or group, including the user ID of that account or group and the

              user name of the account or group, the date and time of the communication, whether attachments existed (subject to the limitations expressed infra);

    (h)    All records—including content—of communications generated by or sent from the Account to any other user or group (including postings); and

    (i)    All records—including content—of communications sent to the Account from Facebook accounts associated with "Tess TheRaven" (using Facebook username "RavenSchiele"), "Jay Gonzo" (using Facebook username "jay.felon.1"), and "Bad-rum Pete" (using Facebook username "badrum.pete").

## II. Information **not** to be disclosed by Facebook

Facebook is prohibited from disclosing to the government the following information for each Account listed in Attachment A, absent further court authority:

    (a)    The contents of any communications sent to the Account, except those sent to the Account from Facebook accounts associated with "Tess TheRaven" (using Facebook username "RavenSchiele"), "Jay Gonzo" (using Facebook username "jay.felon.1"), and "Bad-rum Pete" (using Facebook username "badrum.pete");

    (b)    Photos and videos uploaded by other users, except those sent to the Account from Facebook accounts associated with "Tess TheRaven" (using Facebook username "RavenSchiele"), "Jay Gonzo" (using Facebook username "jay.felon.1"), and "Bad-rum Pete" (using Facebook username "badrum.pete"); and

    (c)    Any records or details about any groups of which the Account was a member, including those that were "liked" or of which the Account was a "fan" (or other similar term) other than the user ID and name of the user or group.

## II. Information to be seized by the government

Upon receipt of the above-described records and content, the government will then conduct a search to determine which relate to the following areas of investigation, as identified in the government's application. These areas are:

(a) Allegations that Joseph Hallford violated:

   a. 26 U.S.C. § 5861 (Possession Unregistered Firearm);

   b. 22 DC Code § 4504(a-1) (Carrying a Rifle or Shotgun (Outside Home or Place of Business)); or

   c. 22 DC Code § 4504(a)(1) (Carrying a Pistol (Outside Home or Place of Business)).

(b) Records and content related to the identity of Joseph Hallford;

(c) Records and content related to any planned armed engagements with targets located in Washington DC or individuals working or present there;

(d) Records and content related to any other armed engagements carried out by Joseph Hallford;

(e) Records and content related to the motive of Joseph Hallford for any planned armed engagements, including evidence of mental illness; and

(f) Records and content related to whether Joseph Hallford had any accomplices in planning or carrying out armed engagements in Washington DC with targets or individuals working or present there.

All records and content that the government determines are NOT within the scope of the investigation, as described above, will either be returned to Facebook or, if copies (physical or electronic), destroyed.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by Facebook, and my official title is _____. I am a custodian of records for Facebook. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Facebook, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

a.   all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

b.   such records were kept in the ordinary course of a regularly conducted business activity of Facebook; and

c.   such records were made by Facebook as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____    _____
Date                                                                Signature